We have only one case on the docket this morning. I'm assuming the lawyers are well familiar with our procedures. I will tell you we had a little trouble accessing the record because parts of the record are not in the record. Other parts of the record are sealed and so on. So we'll probably have a lot of questions about what the record here entails. The case of this morning is United States v. Bowen, number 1331078. Government of Counsel is Ms. Collery. Good morning and may it please the court. Liza Collery on behalf of the United States. A jury found five police officers criminally responsible for killing and for orchestrating a cover-up. After learning that government attorneys had posted anonymous comments online regarding the case, the district court set those verdicts aside. This court should reverse. First and foremost, there has never been any proof in this case or even any allegation in this case that the jury was biased as a result of the comments that was posted online. Instead, relying on theories of supervisory power that the Supreme Court repudiated decades ago, the district court in this case concluded that it could set aside the jury's verdicts in order to punish the government for misconduct and to deter others. Well, let me ask you for the sake of argument, what punishment has been inflicted on the malefactors? Multiple punishments. Well, they're not in the employ, but at least one of them retired, right? Yes, retired but is therefore collecting retirement pay. Is that correct? Yes, but she lost her. She lost her job and I think a loss of job is a very significant sanction. The other attorney who engaged in intentional misconduct also lost his job. But in addition, there has been bar discipline. Both attorneys are no longer members of the Eastern District of Louisiana Bar, and I believe their proceedings pending in multiple other courts, including this court. And there's also a state investigation about Mr Binsky. Mr Binsky was the subject of an O. P. R. Report. She was the subject of a government investigation, and she's still working with tank teams. I don't know the answer to that question. I don't know whether she's still doing that work, but she is not sustained any removal, temporary removal from office or reduction in pay or anything like that. The discipline that Mr Binsky has been subjected to is currently confidential. The O. P. R. Report in her case has not been publicly released. If the court is interested, I could provide the court a letter discussing what discipline she's been subjected to. Well, if you're going to tell us about alternate methods of internal discipline, I'm sure we would appreciate knowing that. I'll do that, Your Honor. But so there were alternative remedies in this case. There are multiple alternative remedies, and one of them was the district court's opinion itself, because that opinion chastised the government in the severest of terms. So all of the remedies that the Supreme Court referenced in the Hastings and Bank of Nova Scotia case, all of those alternative remedies were employed in this case. And in addition, Your Honor, I think from the very get-go, from the first moment that this misconduct was disclosed, the Department has proactively attempted to ensure that this kind of thing never happens again. We have mandatory training for prosecutors every year, and this case has been highlighted for the last three years. I think it's extremely unlikely that there's a federal prosecutor in the United States today who has not heard of this case and is not aware of the government's position that what happened here is misconduct and that there are no exceptions and no defenses based on First Amendment or based on the excuse that it was done in personal capacity. Yes, so what does it do to this case? The government deliberately tried to cover up prosecutorial misconduct. The district court, and I don't know why, we can't find that this gave reasonable grounds to question the integrity of the verdict, in which case, you say he was punishing the government. I don't think so. I think he was trying to protect the integrity of the jury verdict. Why don't we have the authority to apply the Supreme Court's exception here that says that the district court found perjury by government witnesses, found intimidation of potential defense witnesses, and there was clearly a pattern of prosecutorial misconduct right up until the end? So why don't we have the power to affirm the district court's finding that this trial was infected and that the integrity of the procedure, the jury verdict, and the procedure itself was tainted so that a new trial is required? This is a matter of discretion for the district court. He was there. Your Honor, the only claim of misconduct that was properly before the district court at the time this motion was filed was the claim... Not when it was filed, when it was ruled on. He knew a lot more about the time he ruled on it. The only grounds... No thanks to the government. No thanks to Ms. Mann not telling the truth. No thanks to Mr. Bensky hiding. Your Honor, I agree that Ms. Mann did not tell the truth and that was serious misconduct, but the only claim that was properly before the court at the time this motion was filed was a claim that was the posting claim based on the misconduct of Mr. Perricone, who's the only attorney who posted prejudicial comments in this case. But he posted anonymously. When seven of the 12 jurors went to NOLA.com before trial and said that they were familiar with some of this, it was an anonymous posting. It could have been just some grumpy former cop, but had they known that it was the government member of the prosecution's United States Attorney's office who was making these postings, maybe they were influenced thinking that it was a grumpy cop and they believed him. Had they known it was a former, present United States attorney making these postings, trying to influence the jury to convict these people, the potential jury, there might have been a big was incomplete and had to be considered as part of the reason for giving a new trial. How do you avoid that? You can't talk about when the motion was filed. Your Honor, the argument that the voir dire was inadequate was specifically waived by the defendants in this case. The district court asked them whether they were relying on jury bias at the June hearing, and they responded that in light of the voir dire that took place in this case, it would be very difficult to prove juror bias. But that's the difference between the June hearing and a year and a half later when he wrote his final report, don't you think? No, nothing had changed. Nothing had changed except the fact that he did not trust the veracity of the government's report. He had had to have outside investigators from Georgia come in to basically redo the Mann report. He didn't trust Miss Mann. He didn't trust what Perricone had said. Miss Mann had said that she believed in her heart that other people were blogging as well. He said, I can't tell. I am not confident that we've come to the bottom of this. So there were different, a lot of different facts by the time he made his final judgment, which did involve voir dire. But nothing had changed with respect to the integrity of the jury's report. Well, I'm afraid we don't know that. I mean, that's the implication I get from reading 200 pages worth of very conscientious opinions. Under Brecht, we don't have to have prejudice proven under Brecht. No, Your Honor, that's not correct. Yes, it is. Your Honor, the Brecht opinion... I know you argued that in your brief, but I think you're completely incorrect. Our own jurisprudence is a hybrid area. We can identify a hybrid area requiring reversal regardless of harm. This is not, that panel was in the Burgess case, and it's Higginbotham, Reveley, and Benavidez, not exactly a pushover panel. So we have our own jurisprudence in this circuit accepting the Brecht position that you have. Well, first of all, the district court found that there was perjury committed, found that there was intimidation of witnesses, and found this ongoing pattern of prosecutorial misconduct, which is exactly the hybrid kind of situation that Brecht was foretelling, which should eliminate the need to prove prejudice. The Supreme Court has never found that there is an exception to the prejudice requirement, and it certainly would not do so in a case like this case where there are alternative remedies. But in addition, Your Honor... The alternative remedies are meaningless in this case. Thank God there are no other cases like this in the country. The alternative remedies were very severe in this case. But in addition, Your Honor, it is not the case that the district court found any other misconduct in this case. And I believe he must be referring to the 10-page to 11-page portion of its opinion where it referred to other concerns. But none of that, none of those concerns amounted to misconduct. Well, let me ask you then, if there's no misconduct, how come the government didn't appeal the NOV judgment about Hunter's testimony? Yes, Your Honor, I'm glad you asked that. The reason we didn't appeal was because... You didn't know he lied. No, Your Honor... The court found it quite obvious. No, Your Honor, I don't agree with that. We stand by Hunter's testimony. The jury believed it and we believe it was true. And the reason we didn't appeal that was because the district court had that alternative holding that the victim was already dead at the time that Mr. Bowen stomped on his back. And I went back and I read the testimony on that and I decided on that basis alone that we would drop that issue from this appeal, that there were already enough issues before the court. Was there any misconduct by the lawyers that tried the case? No, Your Honor. I'm talking about this witness. Ms. Dobinsky, head of the taint team. She did not try the case. Yes, excuse me, but that's a very important part of securing the sanctity of the prosecution, is it not? It's a very important role. And frankly, I mean, again, from what I read in Judge Engelhardt's order, he was very concerned about the evasiveness of Ms. Dobinsky's answers about the extent of the blogging that she had done and whether she had told anyone else in the department. She never unequivocally said no. She said, well, I'm not sure, I don't remember, blah, blah, blah, who doesn't remember when they're blogging? No, Your Honor, that's based on a misunderstanding of the record. That is based on an audio transcript of an interview that took place in December of 2014. And at the time, Ms. Dobinsky had gone back and had found four of her postings and they were asking her, is this the universe? And she wasn't sure that it was, and she was rightly not sure because it turned out that there were two more postings, but the six postings that we're now aware of were the only postings. And she was being, she reserved a judgment on whether that was the complete number of postings. But I don't understand. First of all, she had been identified, but the reason the judge may, and believe me, it is equally painful to me as it evidently was to this judge who lived through this trial, as did the victims and their witnesses, equally painful to me to have to worry about this situation. But the fact is that Mann was supposed to report on whoever was blogging and she did not tell the truth. Mann, she even implies that she may have told Mr. Letton about it, but that's very vague. The judge didn't believe Mann. He didn't believe Perricone. The government gets involved and it takes until two years later or a year and a half later that the government admits, well, there was another person in, an unnamed attorney in the civil rights department that was conducting blogging. And then he has to drag that out from the special prosecutors from Georgia. So you know, you can sort of, if it had, if the information had dribbled out before a jury like this, I doubt that we would overturn a fact finding. And yet you're asking us to disregard what the judge found about this situation. Your Honor, none of that has anything to do with the jury's verdicts in this case. All of the matters that you just referred to occurred long after the jury rendered its verdicts. And even the most sweeping theories- That's because the government didn't, didn't, wasn't on the straight and up and up. I can find you a thousand quotations that say when the government acts as prosecutor it has to turn square corners. We impose the same responsibilities on everyone in law enforcement and indeed on the police and on the judges. I don't understand this cognitive dissonance between, on the one hand, oh, boys will be boys in this social media age, and on the other hand, pay no attention to that man behind the curtain, the verdict's fine. No one's saying boys will be boys in this social media age. The government acknowledges that this is serious misconduct. But the Supreme Court has indicated over and over again that it bestirs the public to ridicule the judicial process to overturn a jury's verdict without any evidence or any basis to believe that the jury's verdict was, was tarnished in some way. And misconduct, alleged misconduct that occurred after the jury's verdicts in this case can't tarnish a verdict that was rendered before. I know you don't like the Brex Supreme Court opinion, but the footnote 9 is exactly on point here. It says if there is a hybrid error requiring reversal regardless of harm. So, and we're also looking at this from a abuse of discretion standard of review. So where is the abuse of discretion by Judge Englehardt after he knew all of these facts, ultimately knew the facts, and knew that the jury didn't know the facts? Your Honor, I don't believe the Brecht opinion refers to a hybrid error regardless of harm. At best— That's the interpretation by the Fifth Circuit. At best what it does is, is reserve the possibility that at some later date the Supreme Court in the habeas corpus conduct, context, might apply something less than the codiocus harmless error standard. It doesn't leave it up to the Supreme Court. And if they're going to give relief in a habeas proceeding, giving a new trial is much less serious relief. But it doesn't say that they would give relief without any proof of harm at all. What I'm trying to say is, no, it's referring to, I believe it's referring to the possibility that they won't apply the higher codiocus standard, but will apply the Chapman harmless error standard. I do not believe the Supreme Court in the last three decades has ever suggested that you could reverse a jury's verdict for government misconduct without any showing of harm to the jury's verdict at all. And furthermore, this Court in Poole recently concluded that that could not be done. And Poole is a Rule 33 case that's right on point here. In that case, the defendant argued that the jury's verdict should be overturned as a means of punishing the government for misconduct. And this Court held in the last year that there was no authority to do that. And the Court said that it had searched the — Well, the Court here is saying, I think you misinterpret what he's saying. He does rely on supervisory power. I don't think that's necessary. I'm inclined to go with the Brecht idea if that were the outcome we would reach. But what he says is, I think I have found enough to cast serious doubt on the integrity of the process. He said, there is probably more. And the reason he said there is probably more is that he could not believe the veracity of what the government had undertaken to do. And, you know, after 16 months, I think he was entitled to draw that conclusion. Your Honor, there's no reason to think there's anything more. These allegations are now three years old. Let me — They're three years old. That sounds like politicians who say, that's so yesterday. The problem is, I hope that the courts are abiding by and the prosecutors by higher standards. And coincidentally, the newspaper in Houston had an article on Sunday, Judge will appeal ruling she misused social media. And there was a somewhat locally high-profile child abuse case, and the judge there was blogging out during the trial or posting things on her Facebook. And as a result of that, that came to light after the verdict. She was — a charge was brought against her for judicial misconduct. And she said, everything I posted was publicly available information. And then a new judge was — she was removed from the case, a new judge was appointed, and guess what? A new trial was granted. Now, why should the prosecutors be under a lesser standard of integrity than the courts? Your Honor, because the misdeeds of a prosecutor should not result in a new trial unless they impugn the integrity of the jury's verdict. And that did not happen in this case. In fact, the defendants have never even argued that that happened in this case. The motion that they filed had a different theory of prejudice. They did not claim that the jurors were actually biased by any of these postings. The theory of prejudice they advanced was that the postings somehow caused fellow police officers to decide to plead guilty, even though they were innocent, and to testify falsely at trial. And that theory, which is the only theory that was advanced in this case — Well, I don't think you can argue waiver on their part because, again, that was propounded at — when the only thing known was that Sal Perricone had blogged. But that doesn't — that doesn't affect the prejudice theory in this case. Nothing was learned that would change — Well, they did file — let me ask you — they did file a Rule 33 motion immediately after — within 14 days, did they not? They did. And what was the basis for that motion? They had a number of different bases, and it was — except for the Count 10, which the court alluded to, and the Counts 12 and 13, which are the subject of a separate appeal, the district court denied that motion. I understand that, but didn't some of that have to do with the perjury by some of the government witnesses? I don't believe so, Your Honor. All right, well — I don't believe so, but I — maybe we can check on that and see. But, Your Honor, there was no perjury by government witnesses, and that claim that there was is very hard for the government to respond to because we don't — we've never even been told what this perjury consists of.  The government found that Hunter was basically a sociopathic liar, that his — that the notes that Agent Bizak took of his interview with Hunter were completely different from at least two other times when Hunter gave testimony. Your Honor, I don't believe that the record supports that, and the jury was — Well, your briefing on it is pretty cursory, I think, if I recall correctly. Well, I don't agree with that, Your Honor, but in any event, it's the jury's job to determine that. There was cross-examination of one of the government's witnesses using 302s, FBI 302s about what he had told the government. That is — that is par for the course in criminal trials. And the jury gets to decide whether they think that discrepancies between what the witness is saying about tangential matters in court and a 302 written by an FBI agent are significant. And — Of course, when these decisions were made by these witnesses to change their testimony, to plead guilty to a lesser crime and to cooperate with the government, there were postings out there that they didn't know were being issued by the assistant U.S. attorney in the same office as the prosecutors or the potential prosecutors if they were threatening to be prosecuted, which some of them never were. So I don't see how you can disregard that — that taint. Because there's — there's no evidence that any of the cooperating witnesses ever saw them or were influenced — Well, that's witness intimidation. That's what the district judge found. The witness intimidation claim is a different claim from the claim that — that the cooperating witnesses were influenced by Mr. Parakur. Well, then let's call that cooperating witness intimidation. But there's — I know they threatened to take Ms. Gore's children away from her. No, Your Honor, that's not true. They did not. Oh, well. Maybe you should read the record. Your Honor, they did not threaten to take her children away from her. What the statement made was that if she went to jail, she would not be with her children. There was never — Oh, and then taking her away from the children. Excuse me. Yes. Same thing. Right. But that — that statement was not misconduct. An FBI agent does not commit misconduct when he tells a witness, especially a law enforcement witness, of the consequences of perjury and of going — and of going to jail. There — we cited many cases in our brief that make clear that that kind of warning about the consequences of perjury is not witness intimidation and is not misconduct. Is there any case out there that said — that got to the point that says prejudice — that the conduct was so outrageous, we don't have to worry about prejudice? You guys did wrong, and this is how we're going to teach you a lesson. We're going to dismiss this case regardless of prejudice. No, Your Honor. And in fact, the Poole case, which I was mentioning earlier — Excuse me. There's a publicity case. It's like Shepard v. Maxwell. Yes, Your Honor, but the Skilling case, the Supreme Court's most — Well, the Skilling — look, you can't tell a Houstonian about the Skilling case, and it's totally distinguishable on the facts. So, I mean, if there is a — and I'm not saying that Shepard's on point, but that is a case where prejudicial publicity vacated — required the trial. But I'm — go ahead. Yes, Your Honor, but Shepard is an entirely different case. That is a case where — Are we sending out a signal that says to the Department of Justice lawyers, you can cut corners and do things unethical and do what you can to get a conviction, and so long as there's no prejudice, it's going to be upheld by the courts? As long as they're guilty, what the heck? No, Your Honor, I don't think that reversing the new trial order in this case would send out that message. I think the federal prosecutors have already received the message that what happened in this case is misconduct. And I think the district court's opinion, standing alone, makes clear that what happened here is very significant misconduct. And I don't think that if the jury's verdicts were to be reinstated in this case, that it would send that message. Well, let me just ask a question. Why did it take the government so long to acknowledge that it was Ms. Dobinsky in the DOJ who was blogging? I don't think it did take the government so — Months. They identified a civil rights attorney in the Department of Justice. Your Honor, in the — Judge Inglewood had to send out, I guess, a third series of questions asking, tell me this person's name. He could have asked for the name — They could have told him the name. It was — what the special attorneys thought the court was interested in was comments disparaging defendants or revealing confidential or grand jury information. And her comments were innocuous. They seemed innocuous. But the government's position here today is, essentially, that it's irrelevant what the information was as long as it was anonymous and the public didn't — it didn't come over with the imprimatur of the law enforcement people. And I don't see why you can say the prosecutors understood only a very narrow inquiry when you're taking the broadest possible view of the innocuousness. But they disclosed the postings. They gave the judge all of her postings. And all the judge had to do was say, I want to know who posted these. And he — But they knew — somebody in the DOJ knew that she had headed the Bowen-Taint team. Yes, Your Honor, and — And why didn't they just say, well, Judge, we're very sorry, we regret to inform you that it was a person who was in your court only 12 months ago on the Bowen-Taint team? As soon as the judge expressed more interest in this, that's what they said. They said it was the attorney who conducted the Garrity review. As soon as the court expressed some interest in these postings, that's what the government told the court. Usually the government said no member of the prosecution team to leave her out. She wasn't a member of the prosecution team, but she was certainly involved with the trial, the prosecution itself. Yes, but — That's very misleading and very deliberately misleading. No, Your Honor, that's not true. At the time that statement was made, no one had any idea that Ms. Dubinsky had made those postings, and the suggestion that the prosecutor deliberately limited her representation to the court to exclude Ms. Dubinsky is false. That representation was made long before anybody knew about Ms. Dubinsky's postings. But it was never corrected by the Department of Justice until Judge Inglewood had to keep following up. Your time is up, but you have time for rebuttal. Thank you. Mr. Gibbons? May it please the Court, my name is Billy Gibbons. I represent Archie Kaufman. I'd like to start off with the last issue that Ms. Collery was discussing, because I think it goes — it also addresses Judge Prado's question about whether or not the prosecution, the trial team was involved in any misconduct in this case. In 2012, when we first found out about Sal Perricone and his blogging, we had a hearing and the U.S. attorney swore up and down that Sal was the only blogger. They didn't know of any other misconduct. Ms. Mann was sitting at his side. At the same time, they criticized the defendants for being responsible for the leaks to the media. Unbeknownst to that, we knew that — we found out six or eight months later that Jan Mann was doing the same thing. When that happened, it was the same story all over again. The government swore up and down that now it was limited just to Sal Perricone and just to Jan Mann. It wasn't — and it wasn't the government that revealed Jan Mann. It was Hebe's counsel. Correct. Private party's counsel who had done the legwork to — Yes, and I was involved in that case, Judge, too. And I would say that it was a — it was not an easy task at all. Then, in 2012, when Mann was exposed, again, we heard the same thing, and this time there was a sworn declaration or a statement made to the court by the head of the Danziger Bridge prosecution that she — that all current and former members of the prosecution team had sworn to her that they did not blog. This was the second time that the limited — that the representations were limited to the prosecution team. As I think Judge Clement mentioned a minute ago, in 2012 — in June of 2012, when this first came up, the same representation was made, that there was no misconduct and no blogging by the prosecution team. Judge Engelhardt made a special point of saying, that is not what I'm interested in. I want a categorical denial by the government that they did not leak and they did not blog. So now, in June — November of 2012, we're getting the same response. And one — and also important is that in response to the Mann disclosure in November of 2012, Judge Engelhardt issued a 50-page order in reasons on November 26, 2012, and to investigate these matters. He was very clear in that opinion about how troubled he was by the blogging. And then a month later, on December 21, 2012, the government found out about Carla Dubinsky. And that's what took six months for the judge to pull — pull out of them. They came back in January 2013. And by the way, we now know that the prosecution team knew about — about Dubinsky back in December of 2012. Judge Engelhardt is dealing, in the meantime, with the special attorney, John Horn, who came back in January of 2013 saying that there was — that a Civil Rights Division employee had posted comments online. Judge Engelhardt followed up on that, asked for more information. And in March 2013, they came back and they said that employee was actually a Civil Rights Division attorney, but she was not — who gained firsthand knowledge of the case pursuant to a review of investigative materials, but not by participating in the investigation of the prosecution team. He again asked for more information. And in May 2013, they finally disclosed that it was Ms. Dubinsky. The timing of that, I think, also is very important because there was a status conference in April 2013, which was not transcribed and it's not in the record, but there — it is referred to in a letter that's at 42399 of the record. At that status conference, the judge said that he was ready to rule. And it's our belief that the government was sitting on this information about Dubinsky hoping that the judge would rule. And it's particularly troubling that now they're attacking the judge and saying that he was going outside of his discretion and conducting investigations that he was not doing when they didn't complain about that while this was going on because they truly thought that this would never come to light and that the judge would deny our motion and Dubinsky's name would never get out there and none of this would ever become what it's become today. Well, he had intimidated — he was not impressed with the motion initially, right? Yes. Until further investigation was ongoing. Yes. From day one, the judge was — he told us we had a very tough road to hoe and that was at the first hearing in June of 2012. And I would like to go back to that hearing on — at least with respect to the government's waiver argument where they're saying that the judge granted relief on issues that we did not raise. I don't think that's material at this point. Okay. I mean, maybe the other colleagues do, but — Well — But let me ask, what were the subjects of the original post-trial Rule 33 motion? Your Honor, I believe it was — I was not in the case at the time, but it was a sufficiency motion. I do think that we have always, at least — and on this motion, we have always claimed from day one that the blogging, the media leaks created an atmosphere that suborned perjury, that put pressure on targets and subjects in the investigation to come in and plead guilty. And there has been — there's been some testimony by that, by the case agent Bezac at trial, and we cited that in our brief, but that's in — at 38.826 of the record, where — Is it your position that there was prejudice in the case? Yes, sir. You're arguing maybe in this case it's not necessary, but your first position is that you were prejudiced by some of this misconduct? Yes. Yes, Judge. I mean, I do agree that this is the rare case that would fit the Brecht footnote. If this is not a case that fits that exception, I just don't think there ever could be. And how did this misconduct then affect the verdict? Well, Your Honor, I think that the misconduct affected false testimony at trial, and that has been held in numerous cases. O'Keefe, which is a Fifth Circuit case, which we've cited, and MMR Corp., which is also a Fifth Circuit case, and in addition, NAPU, that false testimony clearly affects a jury verdict. And so on that basis alone, I think that from day one, we have always alleged that the judge ultimately found that on at least six witnesses. Judge Engelhardt found that six witnesses testified falsely at trial. He was very specific on it. He was also very troubled by the case agent's testimony and, of course, by Mr. Binsky's testimony, which he relied on exclusively in the words of Judge Engelhardt to deny the Castigar motion before trial. With the fact that the surreptitious, anonymous government posting was discovered late, would that constitute new evidence? Yes, Judge. Yes, we believe so, and Judge Engelhardt accepted that as well. And what's the difference between reading a blog that's anonymous as opposed to being identified from a prosecutor? Would that affect a jury's or a reader's, a potential juror's, response to the information provided? I think that it puts it all in a completely different light, and it actually makes this case much more insidious than the other press cases, the other cases involving abuse of the press, because this was done secretly. And in other cases that have been reversed and where new trials have been granted based on comments by prosecutors, at least we know that it's the prosecutor making these comments, and so they can be, you know, the public and jurors can evaluate that for what they are. They would know the motive? Yes. In which case it might even work against? Correct. And here, there was a conscious effort, we know by Mr. Perricone and Ms. Mann, to try to shape public discourse on cases that their office was handling. There was some testimony about that by Ms. Mann in her OPR interview, and there are blogs posted by Mr. Perricone that we have cited in our brief where he's explicitly saying, you know, we did it, we're, you know, let's move on to Danziger, let's move on to the NOPD, and he's kind of cheering on the blogging community to accomplish some kind of result. How did Bordard take care of this? Wasn't there a Bordard regarding the jurors as to whether they'd seen the blogs and whether it was affecting them when the jury was selected, and how did it affect the jury if we didn't know until after the verdict that Department of Justice lawyer had been involved in blogging? Well, Judge, the jurors were not asked about viewing comments online, and so we don't know, we don't know what the jurors' responses would be, and clearly now that would be a very important area to explore on Bordard. And I think Judge Englehart did note in his ruling that surely they would be subject to further voir dire on that issue if it had been known. And I would like to point out, too, that I don't believe we ever abandoned our argument on a flawed voir dire. And that's in, it was discussed at the very first hearing in June of 2012, and that's in the record at 4475, where Judge Englehart did tell us that that would be our toughest hurdle. I think there's a footnote somewhere in one of his opinions, maybe the second opinion, where he said that you weren't alleging that it affected the voir dire. I think there was some discussion of that. We acknowledged, Judge, that that was a tough hurdle and agreed with it, and I think we moved on to some other issues that was very early on in the case, but I don't believe that we ever affirmatively abandoned that argument. Didn't he affirmatively find that his own voir dire that he conducted was flawed and insufficient? He did, and I think that the district court deserves special deference on that. He deserves deference on this case as a whole, but he was in the best position to judge pretrial publicity, the voir dire, all of those issues, and I think we owe deference to Judge Englehart on that. Is that the royal we like us? Everyone does, Judge. Yes, yes, yes. Also, there's the Supreme Court case, Moomin, which we did, which we've cited, confirms that, that the district court is in a special position to judge the effectiveness of his voir dire. The last thing that I would point out to the court is that it's really the first thing that Ms. Collery stated, which is that Judge Englehart set aside this case because of blogging. That was just the first rock in an avalanche, and what we now know is a parade of horribles, blogging, leaks, false testimony, guilty pleas that the judge called into question, intimidation of defense witnesses, the flawed voir dire, the Castigar hearing that was relied on for Ms. Dubinsky, and probably most important of all was the cover-up that was perpetrated on the judge throughout this. He could never get a straight answer, and it took him almost two years to get to the bottom. And if there's no further questions, I'll . . . I have two procedural questions. With respect to the district court's multiplicity finding, are you waiving that? He's not involved in those defendants. That's correct, Judge. My client, Mr. Kaufman, was not involved in those counts. I thought you were speaking for everyone. Well, if the court has questions on counts 12 and 13, Mr. Mesh is prepared to answer those, and we'd reserve time for that if there are any questions. Otherwise . . . I just have two questions, so I could . . . Had there been no blogging, apparently the defense would not have contended that there was perjured testimony by the witnesses or undue influence on them, intimidation and so on? I think that that would have always come up, and . . . Well, it didn't in the first Rule 33 motion, correct? That's correct, Judge. I mean, this was . . . The blogging was the first step in a series of revelations, but I do think that on . . . That would have always . . . In my mind, it would have always come up on direct appeal in a sufficiency argument. Well, sufficiency is one thing, but claims of perjured testimony or intimidation of the defense witnesses and that sort of thing seemed to me would have to be raised in a new trial motion in order to be preserved for appeal, wouldn't it? Well, that's correct, Judge, and we did. I mean, I do believe we raised those issues when we filed our case against the blogging. And, of course, our theory always was that the reason that that happened was because of manipulation of the media by the government. So, in my mind, Judge, that goes hand in hand. I don't know how it would have come up, or it may not have come up, if we didn't find out about the blogging to begin with. And what is there in the record about the extent of . . . My recollection, from the perspective of Houston, Texas, is that the Times-Picayune wasn't necessarily publishing or wasn't publishing very much at this time, so people were going online for a lot of their news. Is that fair to say? Well, I think at that time, the Times-Picayune was publishing regularly. They've later moved to a three-day week. But I would agree, Judge, that the blogging community at that time was very, very active. And I think as a result of some of this case, I have seen a slowdown in that. But, yes, it was very active at the time. Had this blogging taken place and it turned out they were not Department of Justice officials but citizens and not DOJ people, would that have affected the case to date? Well, I think so because, I mean, part of the problem is that the blogging was advancing a DOJ agenda. Right. But if it was a John Doe citizen doing it, this verdict would still stand today. The reason we have a problem is because it was Department of Justice officials that were doing the blogging. Correct. And I think because that has always been our argument, that the government was doing this to influence testimony and to influence outcome of cases. But the citizen wouldn't have had access to this information. Correct. Even blog. Correct. And that was the reason that we were able to uncover this in the first place is because we noticed that there were commenters that had what seemed to be non-public information that was directed towards government cases. So the how of, how this government manipulation of the media occurred was through the blogging. But is it your position that the media created this perverse, the information created this perverse atmosphere within the public? Yes. And we also believe that there were leaks to the media. You know, that is still an outstanding. The plea that was leaked the day before the plea? Yes, ma'am. That's the only leak, right? Well, I don't believe so. I mean, that's the only one that we explicitly discussed with the judge. But he was presented with a series of other leaks that we do  enforcement sources or sources close to the investigation. And I will, you know, concede that that is not something that we have gotten to the bottom of. But we do have at least two government people attributing those leaks to the FBI. And it is information that is in the province of the FBI. For example, one of them is an article attributed to law enforcement sources stating that the search of the FBI search of computers at police headquarters was fruitful. You know, going back to June 2012, Mr. Letton told the judge that they had, you know, confirmed that no government people were responsible for leaks and that based on their investigation, they attributed it to coming from defense lawyers. That's just one example, though, that I just can't imagine how that could come from a defense lawyer. Why? Or why? Those are things that were in the newspapers, right? Yes, ma'am. If there are no further questions, Judge, I'd cede the rest of my time. May I ask Mr. Letton a question? Ask whatever you want. Ask who? Whoever is responsible. Gibbons. Oh, okay. Good. Take your time. Good morning, Your Honors. The issue about the multiplicity finding. Oh, we're not waiving it. We just felt that the evidentiary issue was so much easier and so we addressed it. You didn't address it in your brief, so. Right. We just chose to discuss the other one because we thought it was easier, but we don't intend to waive it. All right. The other question I have is in the judgment of acquittal under Rule 29, was that an alternative motion, alternative to Rule 33 for a new trial? Yes. Yes. So if the Rule 33 ruling is affirmed, then does the Rule 29 ruling need to be reversed or just ignored? Ignored. Ignored. Okay. Thank you. Thank you. Okay, Ms. Collery. I'd like to just first correct a couple of things that opposing counsel said. The first is that the U.S. Attorney did not ever represent that Mr. Perricone was the only blogger. And that's because no one could know that. And the United States never made those kinds of sweeping statements that he was the only blogger. At the time, it was simply unknowable. Said that no member of the prosecution team. That's right. Because you had to have a defined universe. It's impossible to make sweeping representations. So Ms. Dominski was not a member of the prosecution team. She was not. And at the time that representation was made, nobody knew of her conduct. Well, now they say that the DOJ, I think there is documentary proof that the DOJ did know about her blogging by December of 2012. That's right. And it was disclosed in the January report. As an unnamed civil rights employee in the DOJ. That's right. But as soon as the judge expressed interest in that, the government in March disclosed that the person who made those postings was the attorney. And what was that supposed to do? Was somebody expecting that? Judge Englehardt immediately knew when the name Dominski came up. But he also knew who conducted the Garrity review. Excuse me. This had been two years earlier, hadn't it?       Because it had already been disclosed in March that the person who made those postings was the attorney. And what was that supposed to do? Yes. Yes, Your Honor. But I assume he still remembered who conducted the Garrity. It still seems a little sleazy, doesn't it? It doesn't seem sleazy to me, Your Honor, in light of the fact that what the government thought the court was interested in was postings that disparaged defendants. And her postings merely asked for more information about what was going on in court. And as soon as the court expressed an interest in this matter, the government responded fully to the questions that the court asked. Would some of this blogging include some inside information that was not known by the public? Yes. I'm glad you asked that. There was no confidential information disclosed. No grand jury material and no confidential information. And, in fact, Mr. Perricone's postings are identical to postings that non-government employees made. And the whole category of postings on NOLA.com was of no interest to anyone at the time this case went to trial. It was assumed by everyone that this was... You don't think the people who were going to be witnesses at the trial... Now, he started blogging even before the indictments, did he not? Yes. And you don't think the people who knew they were going to be indicted or people who were potential witnesses in trial were not following the blogs? You can say one thing about the public at large, but this goes to the other question about influence on the testimony. I don't know whether they were following blogs or not, but Mr. Perricone's comments were identical to the comments of others. Those of us who have been the target of unfair investigation know that one gets a supernatural interest in reading anything that comes out at the time. I'm sure that that's right. And that's part of the theory that the government, that the defense and that Judge Englehart were pursuing here about prejudice. I'm sure that's right. But Judge Afric, in a case just... There are other cases like this pending. And in a case that also went to trial that had an almost identical motion, Judge Afric pointed out that the incremental prejudice caused by Perricone was minimal. There were other people who were already posting and they were saying the same things. His postings were just a tiny percentage of the postings that were made on this. They were not based on confidential information. They were not based on grand jury material. Well, you know, it's one thing to say that when a crowd stands outside the courthouse, you know, cheering, demonstrating, carrying placards, yelling and screaming, go get those people, go get those people, that you don't necessarily prejudice what's going on in the courtroom. But if the demonstrators and the haranguers are part of the prosecution team, not associated with the Department of Justice, which is supposed to have its eyes closed to the idea of justice, and fostering this atmosphere, you know, if they didn't indict Bowen first or Hills, Barrios and Hunter and so on, they could come back at them later on. You know, I mean, it is an incredibly intimidating environment when you know, if you know that the people who are supposed to be enforcing the laws of justice are contributing to the atmosphere. But nobody in this case at the time this case went to trial knew what Perricone was doing. Well, again, isn't that, as he said, the insidious feature about it? It does mean that it couldn't be uncovered, but it also means that it eliminated the prejudice. He was posting the same kinds of things that other people were posting. But why, if that is so, why does the Justice, why does Judge Engelhardt cite about 30 pages of statutes, rules and regulations, never comment outside? Yes, Your Honor, that's the Justice Department's policy. Anonymous or not? It's a very important policy, but that doesn't... Same as for judges. It doesn't mean that the prejudice requirement is eliminated in this case. The prejudice requirement still exists, and overturning the jury's verdicts in this case not only bestirs the public to ridicule the judicial process, but it's unfair to the victims in this case. It's very unfair. It is very unfair to the entire process, but a new trial at least would assure that we trust that no blogging will be going on. But the blogging never affected the trial in the first place. Do we know that? I mean, I guess the jurors were never interviewed by the judge afterwards, so we don't know if this prejudice to jurors are not. I mean, are we in that situation? Yes. No, Your Honor, because first the voir dire in this case was extraordinarily extensive, and in addition to the voir dire, everybody had access to a 23-page juror questionnaire, and that questionnaire went in great detail through the attitudes of these jurors. So the defendants had every opportunity to know an extraordinary amount of information about the jurors who sat in this case there. But if they knew that the government might have been out to get a jury verdict at any cost, that might have actually helped the defendants, I suppose. I'm not sure. If what the government was doing is conspiring to affect the civil rights by creating, and I'm not saying these defendants don't misquote me here. The worst that happens here is they'll go back to trial. But if it were thought that people in the government were trying to get retribution by involving the civil rights of these defendants to a fair trial, isn't that exactly what these defendants are accused of doing to Mr. Holmes and Mr. Madison? Well, I think . . . Your Honor, you're saying that there's . . . In terms of the problem that's perpetrated here. No, Your Honor. I think what Mr. Perricone did was misconduct, and it was reprehensible. But it had no effect on what happened with the jury in this case. I don't know that. What happened with the jury, they had to listen to witnesses who had been potentially intimidated, witnesses who gave perjured testimony because of, perhaps because of some of this blogging. There has never been any proof, or even really any serious claim, that witnesses who testified in this case were influenced by Mr. Perricone's blogging posts. And it's important to recognize that the district court allowed the defendants the opportunity to present an ex parte submission, asking what they wanted to prove at an evidentiary hearing in this case. And they never attempted, they never even asked for the opportunity to pursue that theory. They never asked to interview jurors. They never asked to interview witnesses. They never asked to talk to the cooperators in this case. Because they never really believed that any of the postings that he made, which were just like postings other people made, had any effect on the witnesses in this case, or on the jurors in this case. Their theory from the get-go was the supervisory power theory. It was the theory that the district court could punish the government in this case by overturning the jury's valid verdicts. Well, this is where you started, so. Thank you very much. All right. Thank you very much. Court will stand in recess.